We'll hear the next case on the calendar, Macco. May it please the court, my name is Matthew Wynick, I represent the plaintiff appellant, Ron D'Amico. There are two issues on this appeal of a First Amendment retaliation case. The first issue is causation, and the second issue is whether there's a constitutionally cognizable injury. I'd like to start with the first issue. Is there a legal issue about whether or not these individuals were mandated by law to call in this problem with the child? We're not disputing that they are mandated reporters. The question- A, and B, that they reported. Yes, Your Honor. The issue, as I see it, is whether they were motivated in part to report by the plaintiff's complaint about the way her daughter was mistreated in the June of the previous year, June of 2013. You're saying that they called in part because they had to, and in part because they were trying to retaliate? Well, there is a question about whether they had to. We may objectively- That is what a mandated reporter has to do. A mandated reporter has to do. However, there is evidence in this case that there was another case involving a medical care issue of a child, and in that case, one of the defendants didn't call CPS. That is one of the issues that the defendants are saying they called about here, is a medical care issue. So if they're trying to rely on a statute to say we're mandated reporters, there is another case in which they arguably should have called but chose not to. So what I'm saying is there is an element of discretion in this. It's not automatic where we're presented with a set of facts and we say, okay, or the mandated They're using discretion. Is this a particular situation where I should call? And what I'm saying in this particular case, they viewed it, they were looking at the facts, and they were motivated to call based in part on the earlier complaint. But even if we're going to say that the child came to school, made this report about being hit, even if we say that that's a reason, that's an objectively reasonable basis that a mandated reporter should make the call, that's not where this case ended. The defendants here went further and made a false statement, and it's that false statement which triggered the CPS investigation to be open. And that statement is that MAKO has failed to seek out treatment and an evaluation for NM. Was there any evidence that the defendants knew of the falsity? They're saying that they had no evidence one way or the other, which should have been the answer. I'm not sure whether there was evidence that the defendants knew that she, in fact, had called the doctor. No. They didn't know one way or the other. They didn't have evidence that she had called. So it's an unknowingly false statement. It's an unknowingly false statement, but which we're arguing should have been the answer. They're saying that. I'm sorry. You said what? You're arguing what? We're arguing that that should have been the answer. We don't know. Should not be the answer? The answer that they should have given. They're saying that. They called CPS. CPS said, did the mother have the child evaluated medically? And they're saying, we said that she should, but she didn't. They didn't have evidence one way or the other whether she did. So that's what they should have said is, we don't know whether she did or not. We can look into it if you'd like, but we don't know whether she had the child evaluated because they didn't have information one way or the other about whether she did. Did MAKO ever contest, ever tell the school that, no, that's not true? Did, well, I think the answer is no. She learned that the school had said that through the CPS investigation, and at that point I think there was a breakdown in communication between the school. I mean, why isn't, I understand your argument, but why isn't Presti's statement consistent with the fact that MAKO had recently said that she had not, you know, she had not yet agreed to have a school psychologist look at Ann M.? Well, the school psychologist, I think, there was, I think, a mix-up as well. I think Ms. MAKO understood the school psychologist to be Ms. Belitsky with who there was this issue with. So there was some confusion there. But just that very day— Well, that was a confusion in the plaintiff's head, which she said she refused to have her evaluated by the school psychologist. She didn't say, she didn't say, this is, I'm refusing it because I think Belitsky is the school psychologist and she's had this mix-up with Belitsky before. She just said she refused. Well, at that point with the school psychologist, their argument is they were saying we were the first—by the way, we dispute that as well, that she was told to do that. But the first time that we acknowledged that the school made any indication that Ms. MAKO should seek some kind of help was within that week. And that very day, on April 8th, Ms. MAKO emailed the teacher and said, I brought Ann M.? home and I called her doctor and I'm working on getting a referral. As of the time the call was made, the school had that email, Ms. MALDONADO had that email, but they still said that she was refusing to get medical care for her child when just that—within an hour before the call was placed, she said, I'm trying to call the pediatrician and I'm trying to get this evaluation. And so that statement is very much false. And another part of our argument is that Pressy didn't look into any of these things that happened that morning. There was a whole host of things that were happening in the school with Ann M.? on the morning of April 8th that gave reason why a mother might come to the school and pick her daughter up and talk to her and even discipline her. But the principal didn't know anything about that because she didn't speak to the school teacher who had been with the daughter all day, who had been emailing the mother about all of the issues, and who could have conveyed all of this to Pressy and who could have conveyed that to CPS, which again is very troubling that none of these things were given to CPS, which could have painted a more fuller picture and proper picture about what was happening that morning. Did MAKO take Ann M.? home and strike her with her hand and a belt? She did. We don't contest that. That did happen. But again— So then in that circumstance, one could say that at least, you know, giving deference to the school administrators that Pressy had correctly evaluated the situation. I understand the deference and I understand the policy considerations and I understand the difficult position I'm placing the court in. But I think if we look at the facts, not in the vacuum of was it proper to call based on a child reporting hitting, but we have a child who was known to lie, known by all of these actors. Everybody here knew that she would lie. They knew her very well. They knew the daughter very well. They knew the mother very well.  the daughter. Just one day, this student comes to school who they know lies, particularly after lunch, would come back from lunch and lie to the teacher, who had lied that very morning about a teacher hurting her, which was false. And she comes to school and reports this, and the principal doesn't pause, doesn't say, let me gather more facts. I know she lies. Let me just make sure in my mind. Even Maldonado, the teacher who took the initial report from Ann M., she wasn't so sure. Her testimony is, I wasn't sure. I didn't know. She had lied. She lied that very morning about me hurting her. I'm not quite sure. But there is no indication, there's no evidence that Presti used any caution or expressed any doubt to CPS, even if she called and said, hey, I'm not quite sure. She does lie. She didn't say that. She said that the mother hit her at home. And again, the call should have ended there. CPS was not going to take the call. You don't think that, in and of itself, that's pretty extraordinary, that the mother comes at lunch break, takes the kid home at lunch break . . . I don't know if there's any record evidence that this happened before . . . smacks the kid around, brings the kid back to resume school, and the kid says, my mother just beat me at home? You don't think that's an extraordinary . . . that's not an ordinary course event, is it? Again, even if it's objectively reasonable for the district to have taken its actions, I think what they actually did at that . . . No, I'm going beyond that. I'm suggesting that it's a pretty extraordinary set of facts, and it would be kind of unusual not to take action on those facts. Again, even if it's objectively reasonable to say that this was unusual, what the school did shows that they weren't interested in doing a complete job in finding the truth. They really just wanted to take that statement and start the CPS investigation. And that's really confirmed . . . Why is that result not commanded under qualified immunity? The district court didn't reach that question. I know, but I'm asking you, why is it not a result that was required by the qualified immunity doctrine? Under the constitutional claims or under the state law privilege? State law. Well, my argument for that on the constitutional claims would be that the state law privilege shouldn't apply to the constitutional claims. On the question of the constitutional claim and qualified immunity . . . Wait, wait, wait. I'm not understanding what you're saying. Maybe Judge LaValle is asking something else, but why aren't they immune as mandated reporters for making this call? Well, if it is . . . Why doesn't that lead to immunity? If it indeed is retaliation, that's willful misconduct, and that takes you outside the scope of the, I think, Section 419 privilege. And I would argue that that's also the reason that any qualified immunity should attach, that there is evidence that they use this opportunity to open a CPS investigation. Again, even if it was reasonable to say, okay, she's reporting being hit, we call, CPS tells them . . . Because, in fact, that's what happened. But CPS tells them, we can't take the call, and the call should have ended. Then they go on to make these other comments about the lack of medical care. And that's why we're here. That's why this CPS investigation opens. If it's just about the call to hitting, again, CPS takes the call. They said, we can't take that call. They should have hung up, and that should have been the end. But the defendants go further, and they make these false statements about the medical care. And that's why we're here. That's why this whole investigation opens. They went above and beyond saying . . . Bless you, Your Honor. They go above and beyond, and they make these extra comments that have nothing to do with the hitting, that they have no basis, in fact, to make. And that's why the investigation opens, and that's why we're here today. Ten months elapsed between Mako's complaint and Presti's report. What evidence at all do you have of a link between the two? Well, first of all, there's comments directly by the decision-makers showing that they were unhappy with both the manner of Mako's complaint and the content of the complaint. Indeed, both Presti and Bolitski thought it attacked Bolitski's professionalism, and they both admitted that they were upset by the complaint. And contemporaneously with this investigation, Presti tells CPS about this complaint. So it shows that it's very much on her mind. And I understand that when there's a distant temporal proximity, the urge to retaliate might fade. But I think here, the statement by Presti to CPS during the investigation shows that it's very much on her mind, that this wasn't just some distant faded memory, that she was thinking about it, and that she was still upset by it, as she admitted she was at the time the complaint was made. So I think this case is very different than the cases that just hold that some, when all you have is some distant temporal proximity. Sure, it makes sense to say that the urge to retaliate might fade. But here, we have comments by decision-makers. And it's very much like the Summa versus Hofstra case decided by this court, where I think it was seven months. And where there was an email back and forth between two of the decision-makers of the adverse action, talking about the protected activity, which again showed that it was on their mind and they were thinking about it at the time they made the adverse action. I would argue here, again, we have a statement by a decision-maker about the protected activity, at or about the time that the retaliatory conduct was taken. Thank you. Thank you.  May it please the court. My name is Gerald Smith, and I represent the two remaining defendants in this action, Lori Presti and Carrie Bolitski. The district court dismissed this claim on two bases. First, that there was no causal relationship established by the plaintiff between the meeting in June 2013 and the events ten months later in April of 2014. And the district court also dismissed this claim because under the First Amendment retaliation analysis, plaintiff or the appellant had failed to establish that she had suffered a concrete harm. In fact, she had failed to establish that she had really suffered any harm whatsoever, according to the district court. With regards to the causal relationship, and your honors have touched on quite a bit of this already. Appellant's counsel has already characterized a lot of the confusion here as basically a lack of communication or some sort of confusion between the plaintiff, Ms. Mako, and the school. And I would submit that under the unusual deference that is owed to mandated reporters, simple confusion or some sort of lack of communication cannot be immediately chalked up to evidence of malice and evidence of retaliatory intent, and that's the leap that appellant is asking this court to make. I would point that this case is very similar to a decision issued by this court just in November of 2017, Dole v. Huntington Union Free School District. In that case, the plaintiff's family accused the school of First Amendment retaliation based upon a report made to CPS. Now, there's some facts in that case that are worth pointing out. First, in that case, there was actually a dispute as to whether what the student told his teacher was even accurate as to what happened. This case, no dispute. The student came back from lunch, told her classroom teacher exactly what her mother had done to her, and her mother has since admitted in her own deposition that yes, that's exactly what happened. So there's no dispute here as to what the student told her teacher and her principal, and there's no dispute as to what actually happened. In Dole, the report to CPS was made one day after the protected activity. And yet, the court still found in that case no evidence whatsoever of a causal relationship. Here, we have a ten month gap. Now, appellant- In this case, where there's a ten month gap, this is a case involving the parent, not the child being, so this is the first chance. How do you respond to this view? The first chance that the school officials could get back at MAKO was ten months after the complaint. This is not like a case where there's an employee working for an employer and ten months might seem like, depending on the circumstances, a long period of time. If this is the first chance that the school officials could go after the parent, then ten months may not seem like such a long time. Your Honor, you're right if that were the case, but I don't believe the record bears that out, and here's why. Appellant's theory of this case is that the two defendants, the two appellees, were so incensed and angered and held such a grudge over this meeting in June 2013 that they conspired to make up these false statements about counseling and relay those to CPS in order to get this investigation going. There's absolutely no evidence in the record to show why they had to wait ten months in order to do that. They could have made those allegations the day after the June 2013 meeting or at any day before they actually did. So there's no evidence in the record to explain why this actually was the first opportunity they had to do so. If Appellant's theory is true and they conspired to make knowingly false statements to CPS, they could have done that at any point, there was nothing preventing them from doing that. The student was a student in the school in June of 2013 through April 2014, every day. There was no time in which these mandated reporters could not have made the same phone call and concocted the same alleged story to get the CPS investigation going as this retaliation for the June 2013 meeting. So I don't think the record bears or supports the notion that this was the first time. What the record shows is that in April 4th, 2014, the reason they called CPS for the first time ever about this family was that something happened that day, a superseding intervening event. And that's that the student came back and described what this panel has already suggested were rather extraordinary circumstances. That the mother, for the first time ever, had taken her daughter home for lunch, had hit her in the way the student described. She then gives that story consistently to a classroom teacher and a principal. No discussion with a teacher, right? I'm sorry, Your Honor? No discussion with NM's teacher. Who do you mean? I'm sorry. That is on their version, on plaintiff's version of the facts, right? Presti reported the potential abuse after investigating only about an hour without talking to NM's teacher and with the advice of Belitsky about whom Mako had previously complained. Actually, Your Honor, the record shows that she did consult with the classroom teacher. In fact, during Ms. Maldonado's testimony, she specifically testified that when she first was asked the question, did you speak to principal that day, her initial answer was, I don't think I spoke to her until after the report to CPS had been made. Later in the deposition, she has shown a document that she testifies refreshes her recollection that she did in fact report the incident directly to the principal. So the record actually supports that Ms. Presti spoke to Ms. Maldonado and Ms. Belitsky both before the call was made, and all three individuals were in agreement that day and were in agreement in their depositions that this call needed to be made. That as mandated reporters, this was a situation that needed to be given to CPS to make further determinations. And of course, it's very notable that Ms. Maldonado is among those that were in agreement because she's not accused of doing anything wrong here. She wasn't accused of defaming or acting in any way improper, and yet she held the same opinion of the situation as Ms. Presti and Ms. Belitsky. And the only thing that distinguishes them from Ms. Maldonado is that they were at a meeting in June 2013, which again gets to this theory by the appellant that because there was this meeting in June 2013, everything that came afterwards is attributed to that meeting. And it's just too big of a leap to make, and there's no evidence in the record to support that leap. Now, appellant has pointed out these alleged statements that sort of, I guess he says, reveal the anger that was in the minds of Ms. Presti and Ms. Belitsky. Well, it's worth pointing out, first of all, that those emails and conversations took place in the days immediately after the June 2013 meeting. When the meeting was reasonably still fresh in everyone's mind. And I don't think it's unreasonable that a principal and a social worker took the time to create a written memo of a meeting they had with a parent, in which, yes, there was a disagreement. But there's no evidence in the record whatsoever that any statements were made amongst the parent and the defendants, or the defendants themselves, at any point after that. In fact- Isn't it, correct me if I'm wrong. Yes. Presti testified, said in her deposition, that the corporal punishment was her sole motivation for reporting to CPS. Yes, Your Honor, and it was. And everyone- But then in April, but then in April, but then in April 2014, she stressed the fact that MAKO hadn't had NM evaluated for mental health. Well, Your Honor, what the record supports, and again, the only evidence regarding the phone call between Presti and CPS is the testimony of Ms. Presti. That's the only evidence in the record. And what Ms. Presti testified to is that in the conversation with CPS, when the information regarding the corporal punishment was being relayed, questions were posed to her regarding background information, regarding things like counseling. They were unprompted by Ms. Presti, but that became the phone call, and that became the investigation. But it became so at the direction of CPS. And so, again, Appellant's theory is that this anger, this simmering anger from June 2013, it caused these two individuals to lay in wait. So that the minute they were confronted with this situation of alleged physical abuse, which of course they had no way of knowing might or may not ever occur, they suddenly conspired in that moment to not only present those facts, which we all now understand are undisputed. But by the way, if CPS then is to ask any sort of unprompted questions about other background, we'll concoct a story and provide them that information as well. And again, there's no information of such a conspiracy. Ms. Presti and Ms. Belitsky had a conversation, they both testified to before the call to CPS was made. The issue of counseling never came up in that conversation. The issue between them, do we call CPS, was based specifically on the information that had been presented by the student that day. Did the district court adjudicate any state law claims, or were all the state law claims dismissed without ruling on them? That's correct, Your Honor. The defamation claim was dismissed without prejudice. There was no state law claim adjudicated. The only adjudication was a federal claim. Yes, that's correct, Your Honor. So what about qualified immunity? Is there any reason why this case didn't require dismissal under qualified immunity? Well, the district court didn't reach that decision. No. Yeah. I would submit that they mandated- It's a question of law, is it not? Yes, the mandated reporters certainly acted, I believe, reasonably given the circumstances. And that would entitle them to qualified immunity. And when the circumstances call for reporting, one must report even if one has animus against the person being reported. You don't fail to report when reporting is mandated because you have a grudge. You're not allowed to not report because you have a grudge against the person, if that exists. No, Your Honor. In fact, you open yourself up to civil and criminal liability for failing to report. So, was there, what reason, did the district court explain why the court did not rule based on qualified immunity over and above the ruling on the merits? No, I believe the district court just didn't reach it. You did move on qualified immunity, did you not? In our papers before the district court, we did. And they just didn't reach that question because they had dismissed it on these two other issues. Thank you, Your Honor. If I could just very briefly, I know I went over on my- No, you have two minutes. Thank you, Your Honor. I did just want to touch on the point of this conspiracy theory and the laying in wait argument. We're not saying that Belitsky and Presti said, hey, let's just hang out and wait and our opportunity will come. I'm not saying that it's an overt conspiracy. I'm saying that when NM walked into the school that morning, or that afternoon, and said I was hit, it gave them an opportunity to initiate a CPS investigation at any costs. And to cloak their animus- What do you mean by at any cost? At any cost is they called CPS. They said she was hit. CPS said I'm sorry, were there any marks? They said no. They said we can't take the call, that should be the end. But again, they went further. So I know Mr. Smith said they could have at any point made up these false- You said that before too, that should be the end. Right. Do you believe that? I do believe that. They could have, CPS rightfully inquired about, if that's the way the call went, CPS- It happened in Florida. Again, making further inquiry is okay, and according to their version of what happened, they made further inquiry. But the statements just were not accurate or true, or the way they should have been answered if you're being truthful and if you're acting in good faith. If somebody asks you, did the mother have the child examined medically and you don't know, why would you say no? The only conclusion is that they wanted that CPS investigation opened. And the hitting gave them that opportunity to make that call. Another opportunity, I mean there's another option. She could have been wrong, right? Yes. You have to leap to a conspiracy theory, she made a mistake maybe. Well, there's no evidence that she made a mistake. She said she didn't know one way or the other when she answered it. Okay, so she was- So she, I'm sorry, in deposition, she said when she answered that, she didn't know one way or the other. And which again, our position is that should be the answer. I don't know one way or the other. But she said no, mom didn't have the child examined medically. And that's why the investigation opened. Thank you. Thank you both for your arguments. The court will reserve decision.